IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| TONYA L. WHITE,<br><br>                    Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,<br><br>                    Defendant. | CV 16-111-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

On July 17, 2016, Plaintiff Tonya L. White ("Plaintiff") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of Plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f. (Doc. 2.)  On October 24, 2016, the Commissioner filed an Answer (Doc. 17) and the Administrative Record ("A.R.").  (Doc. 18.)

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of the Commissioner's denial and remand for an award of

disability benefits.  (Doc. 22.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 31, 34.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court makes the following recommendations.

## I.      PROCEDURAL BACKGROUND

Plaintiff filed an application for DIB and SSI benefits in December 2012. (A.R. 197-203.)  Plaintiff alleged she has been unable to work since January 1, 2012.  (A.R. 197.)  The Social Security Administration denied Plaintiff's application initially on May 1, 2013, and upon reconsideration on October 8, 2013. (A.R. 113-122, 124-134.)  On October 23, 2013, Plaintiff filed a written request for a hearing.  (A.R. 146-148.)  Administrative Law Judge Michael A. Kilroy (the "ALJ") held a hearing on September 16, 2014.  (A.R. 32-111.)  On December 18, 2014, the ALJ issued a written decision finding Plaintiff not disabled.  (A.R. 8-31.) Plaintiff requested review of the decision on February 9, 2015.  (A.R. 7.)  The ALJ's decision became final on May 17, 2016, when the Appeals Council denied Plaintiff's request for review.  (A.R. 1-6.)  Thereafter, Plaintiff filed the instant action.

//

//

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."  *Flaten*, 44 F.3d at 1457.  In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)).  The Court must uphold the

denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision.  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary.").  However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

**B.   Determination of Disability**

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy.  42 U.S.C.

§§ 423(d)(1)(A), 423(d)(2)(A).  A claimant must meet both requirements to be classified as disabled.  *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process.  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett v. Apfel*, 180 F.3d 1094, 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III.   FACTUAL BACKGROUND

Plaintiff claims to suffer from the severe impairments of deep vein thrombosis ("DVT"), hyperparathyroidism, a learning disorder, depression, anxiety disorder, and eye problems. She asserts that these impairments render her incapable of performing work she previously performed, or any other substantial gainful employment.

### A.   The Hearing

A hearing was held before the ALJ on September 16, 2014, in Billings, Montana, and the following testimony was provided.

//

//

6

### 1.    Plaintiff's Testimony

Plaintiff testified that she lives in an apartment in Billings with her two youngest sons, ages fourteen and twelve.  (A.R. 42-43.)  Both of Plaintiff's sons have been diagnosed with autism; her older son draws disability payments, and Plaintiff has applied for payments for her younger son.  (A.R. 48.)

Plaintiff graduated high school and has attended "a couple of months" of college.  (A.R. 44.)  She left college because she could not keep up with the pace of her classes, especially math and computer classes.  (A.R. 49-50.)

Plaintiff's last full-time employment was as a cashier at the Golden Corral restaurant in Billings.  (A.R. 45.)  She reported having back and leg pain due to the bending, walking, and carrying the job required.  (A.R. 51.)  She also reported having anxiety regarding "how [she] felt that [she] was being treated."  (A.R. 51.) Plaintiff next worked part-time stocking food items at a coffee shop inside St. Vincent Hospital in early 2012.  (A.R. 46-47, 53.)  She has not worked since then. (A.R. 47.)

Plaintiff was involved in a vocational rehabilitation program, but expressed concern about the physical requirements of the jobs the program proposed for her, most notably the St. Vincent job.  She reported being too tired and hurting to spend

time with her children after work, and reported that the job hindered her ability to perform household chores.  (A.R. 52, 54.)

Plaintiff's attorney questioned her about records indicating difficulty following up with her vocational rehab case worker, resulting in what the attorney phrased as "sort of a whole runaround."  (A.R. 54-55.)  Plaintiff responded that the case worker would not believe her protestations that the suggested jobs were too difficult.  Plaintiff's attorney then asked about Plaintiff having difficulty following up with her treating physicians and missing appointments, but the Plaintiff did not have a response.  (A.R. 55.)  Plaintiff's attorney then asked about Plaintiff's documented failures to comply with her prescribed medications.  (A.R. 56.)  Plaintiff responded that she sometimes forgets to take her medications, and other times she had difficulty swallowing her pills.  (A.R. 56-57.)  Plaintiff claims that she is in a "no-win situation" with respect to her mental health medication, because she feels better after she takes her medication, which results in her "overdo[ing] it physically."  (A.R. 77.)

Plaintiff stated that she generally wakes up around 6:45 a.m.  (A.R. 57-58.)  She gets her sons ready for school, and drives them both to school.  (A.R. 58.)  She then relaxes for a few minutes, and sometimes does household chores, such as laundry, dishes, and feeding cats.  (A.R. 58-59.)  She goes to the grocery store but

prefers to go when there are not a lot of people around.  (A.R. 59.)  She reports that it is easier to get things done around the house when she is not employed; however, even when she is not employed, her depression makes it difficult to finish household chores.  (A.R. 62.)  She reports that her depression causes her to put off doing things she should do.  (A.R. 62-63.)  She picks her younger son up from school around 3:00 p.m.; her older son walks home.  (A.R. 64.)  She makes the family dinner before her sons go to bed around 9:00 p.m.  (A.R. 64-65.)  She then goes to sleep around 10:30 p.m. after watching the news.  (A.R. 65-66.)

Plaintiff reports severe sleep problems, resulting from acid reflux, generalized pain, and circulation issues.  (A.R. 66.)  Her inability to sleep increases her anxiety.  (A.R. 66-67.)  She often only sleeps three hours per night.  (A.R. 67.)

She reports pain and swelling in her left foot after standing for ten or fifteen minutes.  (A.R. 67-68.)  She stated that the vocational rehabilitation program never offered her a job that allowed her to be off of her feet.  (A.R. 68.)  She reports that she does not lift anything heavier than groceries, and even then leaves the heavy grocery bags for her sons to carry.  (A.R. 68-69.)  Plaintiff states that she gets headaches daily, and that light aggravates her headaches.  (A.R. 70-71.)  She claims that her biggest impediments to working are her leg pain and her problems

interacting with people due to anxiety.  She states that she "just can't be around people right now."  (A.R. 72.)

Plaintiff reports that her children require significant assistance due to their autism, and that her older child has behavior issues at school.  (A.R. 80-81.)  The children are both involved in programs with the Yellowstone Boys and Girls Ranch ("YBGR"), and they have been assigned a case manager and therapists to assist Plaintiff.  (A.R. 82-83.)

### 2.     Marian F. Martin, Ph.D.

Dr. Martin is a clinical psychologist.  (A.R. 85.)  She has reviewed Plaintiff's file and listened to Plaintiff's hearing testimony, but has had no contact with Plaintiff otherwise.  (A.R. 85.)

The ALJ asked Dr. Martin to identify the mental health issues appearing in Plaintiff's medical records.  Dr. Martin identified the following issues: ADHD, noting that there is limited evidence in the record to support such a diagnosis (A.R. 86-87); mild learning disability, noting that there is evidence in the record suggesting that the diagnosis stems from a 2007 neuropsychological test, but that the record does not contain the actual test results (A.R. 87); expressive writing and learning disorder NOS, noting that this diagnosis appears incomplete for lack of academic achievement scores; depressive disorder, which "varies between fairly

mild but perhaps chronic symptoms to perhaps at times more significant

symptoms" (A.R. 88); PTSD, although records indicate that Plaintiff is not

experiencing many symptoms (A.R. 88); generalized anxiety disorder (A.R. 88-

89); and pain disorder associated with psychological factors and a general medical

condition, although Dr. Martin disputes the method for diagnosis thereof (A.R. 89).

Dr. Martin provided the following opinions as to Plaintiff's limitations:

Plaintiff's activities of daily living are impaired mildly, if at all (A.R. 89); mild to

moderate impairment in social functioning, noting that Plaintiff is "very sensitive

to perceived criticism by other people, and has difficulty being around other

people, because she feels that they are being negative toward her" (A.R. 89-90);

moderate difficulties in concentration, persistence, and pace (A.R. 90); moderate

difficulties in attention, concentration, and immediate processing, although her

verbal comprehension score was in the average range (A.R. 90); moderate

depression, which is alleviated with medication (A.R. 90-91); and no episodes of

decompensation (A.R. 91).  Dr. Martin stated that, if Plaintiff's testimony were

credited as true, her social functioning and concentration, persistence, and pace

difficulties would be elevated to the level of moderate to marked.  (A.R. 91.)

With respect to the other-source letter provided by case manager Marty

Webb (discussed at greater length below), Dr. Martin opined that, if the letter were

credited as true, she would not expect Plaintiff to be able to take care of her children or to live independently.  (A.R. 93-94.)

### 3.    Vocational Expert's Testimony

Dwayne Hall, a Vocational Expert ("VE"), also testified before the ALJ. (A.R. 99-108.)  The ALJ asked Mr. Fortune five hypothetical questions.  First, the ALJ asked Mr. Fortune to make the following assumptions: a person who is 45 years old; has a high school diploma; whose only computer background is with a cash register; who could perform sedentary through medium work, with weight lifting for each category; who can walk and stand for no more than six hours in an eight hour day; unlimited sitting, other than normal breaks; never climbing ladders or scaffolding; all other postural activities occasionally; avoiding exposure to any type of hazard; dealing with the public only one-on-one or in small groups of two or three; only brief, superficial contact with the public; a job requiring limited supervision, once the job is learned; a job that is routine, with no more than occasional learning; a job that is unskilled and entry-level; a job that does not require constant focus for an eight-hour day; a job that does not require high, constant stress, defined as occasional judgment or decision-making; and a job with no fewer than six employees in a small, open worksite, and no more than six

employees when the employees work closely together.[1]  (A.R. 100-102.)  Mr. Hall

stated that such an individual would be able to perform Plaintiff's past jobs of

cashier/checker, janitor, housekeeper/cleaner, and store laborer.  (A.R. 103.)

Second, the ALJ asked Mr. Hall to assume the same person, but with the

additional limitations of alternating between sitting, standing, and walking;

walking no more than 30 minutes at a time, standing no more than an hour at a

time, and being on one's feet at least four hours in an eight hour day; lifting 20

pounds occasionally, and 10 pounds frequently; and no exposure to extreme cold

or vibrations.  (A.R. 103.)  Mr. Hall said the individual would be able to perform

Plaintiff's past job of cashier/checker, with 35 percent erosion, and the additional

jobs of office helper and blood donor unit assistant.  (A.R. 104-105.)

Third, the ALJ asked Mr. Fortune to assume the same person as

hypotheticals one and two, but with marked limitations in concentration,

---

[1] The Court had some difficulty parsing the ALJ's restriction with respect to the
number of coworkers.  The passage reads in full, "[w]e're [looking] at a work site,
and this is arbitrary, but we're going to say no fewer than six employees.  If that
work site is an open area where all the employees have to work together, there's no
separate partitions, and the work site is small – and by small I'm saying probably
the same [size] as your typical fast food kitchen.  If it's a large area, where you
have more employees, if the employees are even closer together, only fewer than
six would be the maximum in the type of work setting I just described."  (A.R.
101.)  The incorporation of this discussion into Plaintiff's RFC is no clearer.  (A.R.
17-18.)

persistence, and pace.  Mr. Hall stated that there would be no work available for such a person.  (A.R. 105.)

Fourth, the ALJ asked Mr. Fortune to assume the same person as hypotheticals one and two, but with the addition of needing ten additional minutes added to each work break on an occasional basis, and/or missing more than two days in a month on an occasional basis.  Mr. Fortune said there were no jobs that would fit that description.  (A.R. 105.)

Fifth, the ALJ asked Mr. Fortune to assume the same person as hypotheticals one and two, but with the addition that the individual could only do fine-print-level reading for an occasional portion of the day.  Mr. Fortune said that individual could perform the jobs of small parts assembler and lavatory sampler carrier.  (A.R. 106.)

## B.    Medical Evidence

The A.R. also includes the following pertinent medical records.  Additional records may be discussed below as appropriate.

### 1.    Treating Other Source Evidence

#### a.    Jan Linse-Frost, MS, LCPC

Ms. Linse-Frost is a licensed clinical professional counselor who treated Plaintiff in psychotherapy from January 4, 2011, through August 14, 2014.  (A.R.

598-634.)  Ms. Linse-Frost first noted that Plaintiff suffers from difficulty coping

with stressors, low self-image, difficulty concentrating, and anxiety.  (A.R. 598.)

Ms. Linse-Frost's notes generally indicate that Plaintiff's symptoms remained

stable over time and that her affect ranged from fair to good.  Notably negative

records include the following: on February 8, 2011, Plaintiff reported that she was

more stressed due to construction at her house (A.R. 603); on March 15, 2011,

Plaintiff appeared mildly depressed due to unemployment (A.R. 606); on June 8,

2011, Plaintiff was struggling with workplace relationships and low self-image

(A.R. 610); on July 6, 2011, Plaintiff was distressed by past abuse and resulting

low self-image (A.R. 613); on November 22, 2011, Plaintiff was distressed by

family crisis (A.R. 618); on December 13, 2012, Plaintiff was distressed by the

behavior of a family member (A.R. 622); on January 17, 2013, Plaintiff was

struggling with issues related to her adult daughter (A.R. 625); and on July 17,

2014, Plaintiff appeared depressed and was struggling with hypersensitivity and

low self-image (A.R. 630).

     In response to an inquiry from the Montana Disability Determination

Services Division seeking her treatment notes, Ms. Linse-Frost drafted a letter in

which she states that her "office notes do not adequately detail the information you

might need for a determination of eligibility for disability benefits for [Plaintiff]."

(A.R. 445.)  Though Ms. Linse-Frost's letter generally identifies the same issues discussed in her treatment notes, it paints a bleaker picture of Plaintiff's functionality.  At no point in this letter, however, does Ms. Linse-Frost opine that Plaintiff cannot work.

Finally, Ms. Linse-Frost filed a lengthy Mental Impairment Questionnaire. (A.R. 636-641.)  The questionnaire included charts designed to plot Plaintiff's potential to work.  The only instance in which Ms. Linse-Frost concluded Plaintiff could not work was with respect to the ability to "[p]erform at a consistent pace without an unreasonable number and length of rest periods," but that limitation would only apply "if work is physical."  (A.R. at 637.)  Otherwise, the document recites the psychological issues noted in Ms. Linse-Frost's treatment records and letter, but does not provide any opinion that Plaintiff cannot work.

### b.    Linda Crummet, ACSW, LCSW

The A.R. does not contain any treatment records from Ms. Crummet, but she submitted a letter in support of Plaintiff's application for disability benefits, in which she explains that she saw Plaintiff in therapy when Plaintiff was a child and again in 2013.  Ms. Crummet's recitation of Plaintiff's psychological difficulties is generally consistent with Ms. Linse-Frost's.  Ms. Crummet opines that Plaintiff "is unable to work at this time in her life.  Her ability to manage the needs of her

children and maintain a family life seem to use all of her coping skills.  This is directly related to and consistent with her intellectual and emotional levels."  (A.R. 645.)

### c.    Peg Guhn, MS, LCPC

Ms. Guhn is a licensed clinical professional counselor who was referred by a YBGR Youth Case Manager to treat Plaintiff's children in psychotherapy.  She submitted a letter on Plaintiff's behalf on September 8, 2014.  (A.R. 643.)  It is unclear from the letter if Plaintiff was actually a patient of Ms. Guhn's, or whether Ms. Guhn merely became acquainted with Plaintiff through her professional relationship with Plaintiff's children.

Nevertheless, Ms. Guhn reports that Plaintiff has "decompensated both physically and emotionally" in the wake of her husband's death.  Similar to the reports of other witnesses in this case, Ms. Guhn reports that Plaintiff "has constant insecurities and persecutory thoughts about anyone who she is interacting with if she feels they are questioning her in any way."  Ms. Guhn concludes that "[t]his behavior, along with her physical health, makes working very difficult, if not impossible."

//

//

17

### 2.     Examining Physician Evidence

### a.     F. Tom Peterson, Ed.D.

Dr. Peterson examined Plaintiff on March 21, 2013, but did not treat her.  He drafted a "Psychological Evaluation (SSA – MT DPHHS – Disability Determination Services)" document based on the findings from his examination. (A.R. 452-463.)

Dr. Peterson noted that Plaintiff was delayed in learning to speak and read. (A.R. 453.)  He noted significant items in Plaintiff's reported medical history, such as, *inter alia*, a head injury in infancy, pregnancy complicated by depression at 19, strangled by significant other and rendered unconscious while pregnant at 21, and diagnosed with DVT at 31.  (A.R. 454-455.)  Significant items in Plaintiff's reported psychiatric history include inpatient treatment for depression at 17 and 19, intermittent counseling for depression from ages 8 to 43, and diagnosed with PTSD at 33.  (A.R. 455.)  Dr. Peterson relayed a description of Plaintiff's daily activities that is generally consistent with Plaintiff's testimony on that point.  (A.R. 457.)

Dr. Peterson discussed the results of his examination of Plaintiff (A.R. 457-462), which included the following conclusion regarding Plaintiff's ability to engage in work-related activity:

> The claimant demonstrates adequate intellect and psychological authority to engage in some type of work-related activity.  However,

demonstrated deficits of attention and processing would pose a barrier to her ability to adequately address employer expectations. Additionally, she demonstrates considerable difficulty with time frames. She finds it difficult to internalize an awareness of completing tasks within a given time frame.

[…]

Perhaps with treatment for attention issues, the claimant would be better positioned to engage in competitive work-related activity.

(A.R. 462.)

### b.    Brian Schnitzer, M.D.

Dr. Schnitzer examined Plaintiff on March 25, 2013, but did not treat her. He drafted a "Disability Examination" document based on the findings from his examination. (A.R. 465-468.)

Dr. Schnitzer recited Plaintiff's report of her medical history. (A.R. 465-466.) He then noted the findings from his medical examination, including in pertinent part the following: Plaintiff's general conditioning is "at least fair"; she dresses and undresses herself, and positions herself about the examination table without difficulty; although Plaintiff's intellect/cognitive functioning may be borderline, she is pleasant and cooperative; Plaintiff has some directional functioning issues with her left eye, but otherwise her head, eyes, ears, nose, and throat are generally okay. (A.R. 467.)

Dr. Schnitzer concluded he "would imagine her capable of standing/walking/sitting much of an eight-hour workday five days per week, most particularly if allowed to move about from one position to another as necessary. She does seem capable of many work-related activities and voices interest in at least 'part-time work.'" (A.R. 467.)

### 3.   Non-Examining Physician Evidence

#### a.   Ronald Hull, M.D.

Dr. Hull reviewed Plaintiff's medical records, but did not examine her, and did not testify at the hearing.  He issued an opinion on April 30, 2013.  (A.R. 113-122.)  Dr. Hull opined that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently.  (A.R. 119.)  Dr. Hull found Plaintiff can stand and/or walk for six hours in an eight-hour workday, and also sit for six hours in an eight-hour work day.  (A.R. 119.)  Dr. Hull also stated Plaintiff can perform unlimited pushing/pulling; frequently climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds.  (A.R. 119-120.)  He advised that Plaintiff could be expected to perform work at the medium physical demand capacity.  (A.R. 120.)  He concluded that Plaintiff is not disabled.  (A.R. 122.)

//

### b.      Marsha McFarland, Ph.D.

Dr. McFarland reviewed Plaintiff's medical records, but did not examine her, and did not testify at the hearing.  She issued an opinion on April 1, 2013. (A.R. 113-122.)  Dr. McFarland determined that Plaintiff had the severe impairments of coagulation disorder and borderline intellectual functioning.  (A.R. 117.)  She also noted the following impairments that do not precisely satisfy any diagnostic criteria: organic mental disorder, anxiety-related disorder, and somatoform disorder.  (A.R. 117-118.) With respect to these non-specific disorders, Plaintiff has no restriction of activities of daily living; mild difficulties in maintaining social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation.  (A.R. 118.)

### c.      William Fernandez, M.D., and Dean Gregg, Ph.D.

Dr. Fernandez and Dr. Gregg reviewed Plaintiff's records at the reconsideration phase, and affirmed the findings of Dr. Hull and Dr. McFarland. (A.R. 124-134.)  There are no significant departures from the earlier review.

### 4.      Non-Treating Other Source Evidence

### a.      Marty Webb

Mr. Webb is a Targeted Youth Case Manager for YBGR – Community Based Services; he has been the case manager for Plaintiff's minor children since

May, 2009.  He has no direct professional relationship with Plaintiff, except that he interacts with her "on an almost daily basis" in his role as her children's case manager.

Mr. Webb submitted a letter on Plaintiff's behalf on September 11, 2014. (A.R. 404.)  Mr. Webb reports that Plaintiff calls him between four and ten times per week to seek input on events in her life.  He reports that she "will avoid any type of stressful situation or conflict" and "assumes and continually conveys a posture of apology for almost everything that she says or tries to do."  He has observed her being unable to leave her home for weeks at a time, except for necessities.  Simple conversations have to be repeated to her over and over.  Her tendency to fixate on interactions with co-workers hinders her ability to maintain a job.

In spite of Plaintiff's difficulties that Mr. Webb documents, at no point in his letter does he state an opinion that she cannot work.

### b.    Astghik Iknatian, MS, CRC

Ms. Iknatian served as Plaintiff's vocational rehabilitation job coach from October 8, 2011, through January 21, 2013.  Ms. Iknatian submitted a letter on Plaintiff's behalf on September 16, 2014, wherein she repeats many of the same observations with respect to Plaintiff's mental health that have been reported by

Plaintiff's therapists and by Mr. Webb.  (A.R. 409.)  Ms. Iknatian concludes that, "based on [her] observation I think that [Plaintiff] cannot keep a job due to [the] severity of her mental illness."

### C.   The ALJ's Findings

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2012.  (A.R. 13-14.)  Second, the ALJ found that Plaintiff has the following severe impairments: "history of [DVT], hyperparathyroidism, learning disorder, depression, and anxiety disorder."  (A.R. 14)  Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any one of the impairments in the Listing of Impairments.  (A.R. 14-17.)  Fourth, the ALJ stated Plaintiff has the residual functional capacity ("RFC") to:

> perform sedentary through medium work as defined in 20 C.F.R. 404.1567(a)-(c) and 416.967(a)-(c), which includes the weight and lifting requirements for each of the three exertional categories.  The claimant can stand and walk for a combined total of no more than six hours in an eight-hour day.  The claimant can sit for an unlimited amount of time, besides the normal breaks in the workday, and for eight hours in an eight-hour day.  The claimant can never climb ladders and scaffolds and all other postural activities are limited to occasional.  She must avoid any concentrated exposure to hazards, such as unprotected heights or open, dangerous machinery.  Regarding social functioning, when dealing with the public, the claimant is limited to one on one contact or interaction in small groups of two to three people, no more

than that number of individuals at any one time. The contact is further limited to brief and superficial contact, with nothing that requires in depth contact with any particular person. The claimant must work at a work cite [sic] that has no fewer than six employees, if that work site is an open area where all the employees have to work together, with there being no separate partition, and is also small, for example, the same size as a fast food kitchen. If it is a larger area, there can be more employees. Once the job is learned, the claimant is limited to minimal supervision, with jobs requiring concentrated, over the shoulder, critical supervision being eliminated. Regarding concentration, persistence, or pace, it is preferable that the claimant perform a routine job, with some new learning, but no more than occasional. The claimant is limited to unskilled work, at the entry level, SVP level of 3. The claimant cannot perform jobs requiring high constant focus throughout an eight-hour period of time, for example, an assembly line position. Also, the claimant cannot perform jobs that require high, constant stress, which is as any job that requires more than occasional judgment or decision-making.

(A.R. 17-23.)

The ALJ next found that Plaintiff is able to perform the past relevant work of housekeeper cleaner, in addition to being able to perform the requirements of representative occupations such as office helper and donor unit assistant. (A.R. 23-25.) Thus, the ALJ found that Plaintiff is not disabled. (A.R. 25.)

## IV.   DISCUSSION

Plaintiff argues that the ALJ erred in the following ways: (1) failing to give proper weight to Dr. Peterson's opinion (Doc. 22 at 3-6); (2) failing to give proper weight to the opinions of Plaintiff's treating therapists (*Id*. at 6-16); (3) failing to properly credit Plaintiff's testimony (*Id*. at 16-23); (4) improperly assessing

Plaintiff's credibility based on her daily activities (*Id*. at 23-25); (5) failing to give the lay witness statements proper weight (*Id*. at 25-27); and (6) improperly assessing Plaintiff's RFC (*Id*. at 27-29).

### A.     The ALJ's Evaluation of Dr. Peterson's Opinion

Plaintiff contends that the ALJ failed to give proper weight to Dr. Peterson's opinion.  In response, the Commissioner argues the ALJ properly considered the examining psychologist evidence.

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995.)  The Commissioner applies a hierarchy of deference to these three types of opinions.  The opinion of a treating doctor is generally entitled to the greatest weight.  *Id*.  ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."); *see also* 20 C.F.R. § 404.1527(c)(2).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician."  *Lester*, 81 F.3d at 830.

"As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician.  And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  *Id*. at 830-831 (citations omitted).  The ALJ can accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors' are correct."  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).

To the extent Plaintiff maintains Dr. Peterson concluded that Plaintiff cannot work, his opinion would be contradicted by the reviewing psychologist, Marsha McFarland, Ph.D.  Under those circumstances, Dr. Peterson's opinion could only be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record."

The ALJ gave partial weight to Dr. Peterson's opinions, "acknowledg[ing] that the claimant has limitations in attention and concentration," but concluding

that "the evidence reflects that the claimant is not as limited [in attention and concentration] as [Dr.] Peterson opines."  (A.R. 21.)

Though the ALJ did not directly provide his reasons for discounting Dr. Peterson's opinions in the paragraph in which those opinions are discussed, that conclusion is preceded by an extensive discussion of the Plaintiff's mental and physical abilities and limitations.  (A.R. 19-21.)  This includes a lengthy discussion of Plaintiff's documented issues with taking her medication, and the extent to which her mental health condition improves when Plaintiff does take her medication.  (A.R. 20-21.)  Plaintiff was not taking her medication when Dr. Peterson examined her in March of 2013.  (*See* A.R. 485, noting on March 25, 2013, that Plaintiff has "stopped all of her medications" and that her provider "will not treat her if she does not improve in her compliance with appointments and medications".)

Dr. Peterson ultimately concluded, "[p]erhaps with treatment for attention issues, the claimant would be better positioned to engage in competitive work-related activity."  (A.R. at 462.)  But as noted in the ALJ's decision, Plaintiff reported no problems with her attention to tasks once she resumed her medication. On the contrary, a medical record dated April 29, 2013, indicates that Plaintiff "has gone back on her medications," "apologizes for having stopped them," "feels much

better," and "is not anxious or depressed." (A.R. 482.)  Her provider "encouraged her to look for part-time work now that she has a little more energy and is no longer depressed." (A.R. 483.)  "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."  *Warre v. Comm'r*, 439 F.3d 1001, 1006 (9th Cir. 2006).

In addition, the ALJ cited to specific treatment notes in the record where Plaintiff's mental status was documented to be "normal," "intact," and "stable." (A.R. 21.)

Therefore, the ALJ properly gave Dr. Peterson's opinion partial weight.  It is clear that his opinion was provided during a time Plaintiff was not taking her medication, and where records indicate that Plaintiff's symptoms improved when she resumed her medication, and document a normal, stable mental status.  These constitute specific and legitimate reasons supported by substantial evidence in the record for giving the opinion lesser weight.

## B.     The ALJ's Evaluation of Plaintiff's Treating Therapists

At the time Plaintiff's claim was filed, the Social Security regulations separated medical evidence into two categories: (1) "acceptable medical sources," which includes licensed physicians and licensed or certified psychologists; and (2) "other sources," which includes nurse practitioners, physician's assistants,

therapists, and counselors.  20 C.F.R. 416.913(a), (d) (amended March 27, 2017).

*Leon v. Berryhill*, 2017 WL 7051119, *3 (9th Cir. Nov. 7, 2017) (noting that prior

to March 27, 2017, opinions of "other sources," such as nurse practitioners were

not given the same weight as a physician's opinions).  Opinions of "other sources,"

are not entitled to the same deference.  *Molina v. Astrue*. 674 F.3d 1104, 1111 (9th

Cir. 2012).  The ALJ may discount opinions from "other sources" if the ALJ gives

"germane reasons" for doing so.  *Id.*

### 1.    Ms. Linse-Frost

As a licensed clinical professional counselor, Ms. Linse-Frost is not an

acceptable medical source but is rather an "other" source.  20 C.F.R. §

404.1513(d).  The ALJ discussed Ms. Linse-Frost's opinions at length and gave

them partial weight, explaining, "[a]lthough Ms. Linse-Frost is not an acceptable

medical source, her opinion is consistent with the evidence in the record."  (A.R.

22.)  This was an error.

The fact that Ms. Linse-Frost is not an acceptable medical source is not, in

and of itself, a germane reason to afford her opinion lesser weight, especially

where the ALJ concedes that her opinion is consistent with the evidence in the

record.  *Haagenson v. Colvin*, 656 Fed.Appx. 800, 802 (9th Cir. 2016) ("The only

reason that the ALJ offered for rejecting their opinions is that they are not

'acceptable medical sources' within the meaning of the federal regulation. However, the regulation already presumes that nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider them as 'other sources.'")

The ALJ also failed to provide any germane reason for rejecting Ms. Linse-Frost's opinion that Plaintiff would be absent from work three or more days per month, even though he specifically noted that opinion in his determination letter. (A.R. 22.)  That opinion is important because the VE testified that missing three or more days per month on a regular basis would prohibit Plaintiff from working. (A.R. 105.)

Accordingly, the Court finds that the ALJ erred with respect to Ms. Linse-Frost because (1) he did not provide a germane reason for affording her opinion lesser weight and (2) he did not provide any explanation for dismissing her opinion that Plaintiff would miss three or more workdays per month.

### 2.      Ms. Crummet and Ms. Guhn

As discussed above, Ms. Crummet and Ms. Guhn submitted letters in support of Plaintiff, each concluding that Plaintiff cannot work.  (A.R. 643, 645.) The ALJ addressed these letters in a short paragraph along with other "various third parties."  (A.R. 23.)  This paragraph is problematic for two reasons.  First, the

ALJ simply omits the level of weight he afforded to these witnesses, so the Court

cannot tell how significant he considered their submissions to be.  (A.R. 23 ("The

undersigned gives weight to these letters….For this reason, the undersigned gives

the various letters submitted by third parties weight.").)

Next, even assuming from context that the ALJ afforded the letters limited

weight, he does not distinguish between the various letters at all.  Rather, he

concludes that, collectively, "the evidence in the record reflects that some of the

descriptions provided by these various third parties are rather extreme."  (A.R. 23.)

"[C]ompetent lay witness testimony *cannot* be disregarded without

comment, and…in order to discount competent lay witness testimony, the ALJ

must give reasons that are germane to each witness."  *Molina*, 674 F.3d at 1114

(emphasis in original).  The ALJ's conclusion that "some of the descriptions" in

the third-party letters are "rather extreme" is not a reason germane to each witness

to reject the testimony.  The ALJ does not explain which descriptions in which

letters are "rather extreme," so it is impossible for the Court to assess whether the

record substantiates that conclusion with respect to each individual witness.

Moreover, given the ALJ's conclusion that only "some" of the descriptions are

extreme, the Court presumes at least "some" other descriptions are not extreme,

and the ALJ does not indicate the basis for rejecting those descriptions alongside the unspecified extreme ones.

The Court notes that the Ninth Circuit "[has] not…required the ALJ to discuss every witness's testimony on [an] individualized, witness-by-witness basis. Rather, if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Id.* Here, however, the ALJ does not indicate at all which aspects of the various third-party letters he believes to be "rather extreme," so the Court cannot assess each letter individually and determine whether the same reasoning could apply to one or more third parties. Simply put, in order to meet the standard for rejecting lay witness testimony, the ALJ must do more than group together four unrelated letters and declare without explanation that "some of the descriptions" contained therein are "rather extreme."

Accordingly, the ALJ erred with respect to Ms. Crummet and Ms. Guhn because he did not provide any germane reasons for rejecting their opinions.

**C.    The ALJ's Determination of Plaintiff's Credibility**

Plaintiff argues that the ALJ's credibility determination was erroneous because the ALJ made only a general credibility finding without providing clear

and convincing reasons for rejecting her testimony.  The Commissioner counters

that the ALJ properly evaluated Plaintiff's credibility.

The credibility of a claimant's testimony is analyzed in two steps.  *Vasquez*

*v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine

whether the claimant has presented objective evidence of an impairment or

impairments that could reasonably be expected to produce the pain or other

symptoms alleged.  *Id.*  Second, if the claimant meets the first step, and there is no

affirmative evidence of malingering, the ALJ may reject the claimant's testimony

only if she provides "specific, clear and convincing reasons" for doing so.  *Id.*  "In

order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make

'a credibility determination with findings sufficiently specific to permit the court to

conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Turner*

*v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).

"General findings are insufficient; rather, the ALJ must identify what testimony is

not credible and what evidence undermines the claimant's complaints."  *Reddick*,

157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)).  *See also Brown-Hunter v.*

*Colvin*, 806 F.3d 487, 494 (9th Cir. 2015).  The clear and convincing standard "is

not an easy requirement to meet: '[It] is the most demanding required in Social

Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

To assess a claimant's credibility, the ALJ may consider (1) ordinary credibility techniques, such as the claimants reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  *Chaudry v. Astrue*, 688 F.3d 661, 672 (9th Cir. 2012); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989).  An ALJ may also take the lack of objective medical evidence into consideration when assessing credibility. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004). However, the ALJ may not reject the claimant's statements about the intensity and persistence of their pain or other symptoms "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. § 404.1529(c)(2).

Here, the first step of the credibility analysis is not at issue.  The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and there is no argument that Plaintiff is malingering.  Therefore, the ALJ was required to cite specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony about the severity of her symptoms.

The Court finds that the ALJ presented clear and convincing reasons for discrediting Plaintiff's testimony.  (A.R. at 19.)  Significantly, the ALJ noted Plaintiff's long history of non-compliance with her treatment, including one instance where she voluntarily closed a vocational rehabilitation relationship after being confronted about her dishonesty with the case worker.  (A.R. at 248.)  The ALJ also cited evidence that Plaintiff's symptoms are alleviated when she takes her medications, but that she routinely fails to take them despite her improvement when she does.  These constitute clear and convincing reasons for finding Plaintiff less than credible.  *See Tonise v. Colvin*, 2015 WL 5286048, *3-4 (C.D. Cal. Sept. 9, 2015); *see also* 20 C.F.R. § 404.1530(a)-(b) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work. ... If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.".)

Therefore, the Court finds the ALJ provided specific, clear and convincing reasons for his conclusion with respect to Plaintiff's credibility.

### D.    The ALJ's Assessment of Plaintiff's Daily Activities

Plaintiff argues that the ALJ erred in using her daily activities as a basis to find her less credible.  The Commissioner argues that Plaintiff's daily activities are

inconsistent with that of a totally disabled person, and the ALJ therefore did not err.

First, while the ALJ did consider the extent of Plaintiff's daily activities when assessing her credibility, those activities were not the only reason he deemed her less than credible.  (A.R. at 19.)  The Court has already determined that the other reasons the ALJ provided were sufficient.  Accordingly, even if he had erred with respect to her daily activities, it would constitute harmless error.  "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion."  *Molina*, 674 F.3d at 1115.

Regardless, the ALJ properly considered Plaintiff's level of activity in assessing her credibility.  *See Id.* at 1113 ("Even where [everyday] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").  The ALJ never disputes – and in fact finds – that Plaintiff has significant physical and mental health issues.  Nevertheless, he cites her fairly extensive daily activities as inconsistent with a total disability.  Notably, evidence in the record suggests that Plaintiff has refused employment in the past if that employment will interfere with her daily activities (particularly dropping off

36

and picking up her children from school).  (A.R. at 263-265.)

Accordingly, the ALJ did not err in using Plaintiff's daily activities to find her less credible.  Moreover, even if he had erred, it would be harmless because he provided other sufficient reasons for finding her not to be credible.

### E.  The ALJ's Treatment of Lay Witnesses

Plaintiff argues that the ALJ erred with respect to the lay witness letters submitted by Mr. Webb and Ms. Iknatian.  The Commissioner contends the ALJ's treatment of these witnesses was sufficient.

As with other medical sources, "[l]ay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account.  We have held that competent lay witness testimony *cannot* be disregarded without comment, and that in order to discount competent lay witness testimony, the ALJ must give reasons that are germane to each witness."  *Molina*, 674 F.3d at 1114 (citations and quotations omitted) (emphasis in original).  Especially germane to this case, "[d]isregard of the testimony of friends and family members violates 20 C.F.R. § 404.1513(e)(2)(1991).  According to that regulation, the Commissioner will consider observations by nonmedical sources about how impairments affect a claimant's ability to work."  *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996).

For the same reasons discussed above with respect to Ms. Crummet and Ms. Guhn (*see* § IV(B)(2), *supra*), the Court finds that the ALJ did not provide germane reasons to discount the opinions of these lay witnesses.  It is possible that Mr. Webb's and Ms. Iknatian's opinions were "rather extreme," as the ALJ phrased it, but the ALJ has not identified which parts of their letters he believes to be extreme, nor pointed to any evidence in the record to support that conclusion.  Again, while the ALJ need not "discuss every witness's testimony on [an] individualized, witness-by-witness basis," he must at least provide germane reasons for discounting the opinion of one witness and explain why those reasons are also applicable to any other pertinent witnesses.  *Molina*, 674 F.3d at 1114.  He failed to do so here.

Accordingly, the ALJ erred with respect to Mr. Webb and Ms. Iknatian because he did not provide any germane reasons for rejecting their opinions.

## F.      The ALJ's Assessment of Plaintiff's RFC

Because the Court concludes that the ALJ failed to properly analyze the other medical source and lay witness opinions, the Court need not reach Plaintiff's allegation that the ALJ failed to properly assess Plaintiff's RFC.  The limitations identified by the other source and lay witnesses, and the extent to which they should be credited, are inextricably linked to the ALJ's determination of Plaintiff's

RFC.  The RFC issue therefore is moot due to the ALJ's errors in providing

sufficient basis to reject the other medical source and lay testimony.  On remand,

the ALJ should incorporate any changes in Plaintiff's RFC that arise from his

analysis of that evidence.

## V.  REMAND OR REVERSAL FOR BENEFITS

Plaintiff asks the Court to reverse the decision and grant her benefits.  (Doc.

22 at 30.)  "[T]he decision whether to remand a case for additional evidence or

simply to award benefits is within the discretion of the court."  *Reddick*, 157 F.3d

at 728.  If the ALJ's decision "is not supported by the record, 'the proper course,

except in rare circumstances, is to remand to the agency for additional

investigation or explanation.'"  *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012)

(quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional

proceedings can remedy defects in the original administrative proceedings, a social

security case should be remanded.  Where, however, a rehearing would simply

delay receipt of benefits, reversal [and an award of benefits] is appropriate."  *Lewin*

*v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand,

the ALJ shall more clearly identify the weight given to each other-source and lay

witness, and provide germane reasons for rejecting their opinions.  In addition,

with respect to Ms. Linse-Frost, the ALJ must address her conclusion that Plaintiff would be likely to miss three or more days of work per month, and explain why he gave her opinion only partial weight after conceding that her findings were consistent with the evidence in the record.

## VI.     CONCLUSION

Based on the foregoing findings, the Court recommends that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED this 1st day of March, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge